All right. The next case before the court is 14-1221, Astrazeneca AB v. Apotex Corp. Mr. Hurst, you want only three minutes for rebuttal, is that correct? Yes, Your Honor. Okay. You may begin. May it please the Court, my name is Jim Hurst and I represent Apotex. Our briefs identify multiple independent grounds for reversal, but I want to focus on just two, apportionment and switching costs, starting with apportionment. The District Court below was required, but declined, to assess damages based on the incremental value of the claimed formulation over and above the prior amendment resolved. But didn't the District Court make a specific factual finding that it was the coding that in fact imbued the product with its value? Well, obviously if you just send out the active ingredient itself, it's not going to have any value. But that's not to say that the active ingredient doesn't have value. The active ingredient, omeprazole, was the subject of a patent that expired in 2001, and everybody agreed that it had enormous value. It was the gold standard PPI. It was the reason people purchased Apotex's product, as the District Court found. Remember, the District Court specifically found that, of course, she said, of course, consumer demand was not driven by the formulation itself. And that makes sense, right? Because the active ingredient is what does the job. And here, the District Court not only declined to apportion value and separate the incremental value of the claimed formulation over and above the omeprazole, she found that it would be improper to do so. She didn't make any attempt. The result was? Well, she said, I recognize that the concept of apportionment, but she said, number one, this is the smallest saleable unit, which we have said at least is one measure of assuring that you're making some effort to apportion. And then she said, number two, even if the coding doesn't drive consumer demand, it does meet that alternative phrasing that we have used in our cases, which is to essentially imbue the product with its value. I don't think she made that second finding, Your Honor. She did say that it had value, but she didn't make a finding that it met the standard for applying the entire market value rule, which is you have to find that the claimed formulation is the sole reason that people are buying the product. And that finding couldn't be made here, of course, because the omeprazole was in the prior art. It was a valuable prior art compound. Think about it this way. Well, but without – let's assume there was only one delivery mechanism here, one formulation that would work. Without the delivery mechanism, the drug was useless. True. At least let's hypothesize. It seems to me pretty close to the fact. Yeah. Doesn't possession of the one key that unlocks the drug, isn't that equivalent to having the drug, since the drug is useless without the key? Not according to this court. In laser dynamics, for instance, there was an issue about the optical disk drive in a computer. And what this court found is it might be that without the disk drive, nobody would buy the computer, so the product becomes valueless. You'd go to alternative computers with disk drives. So in that instance, this court said, yes, it might be very valuable. It might make the difference between a commercially viable and a non-commercially viable product, but you still have to recognize that there are different value drivers, multiple different value drivers for a computer, no different here. There's no question that the active ingredient was an essential value driver for our product. No question about that. And yet the district court ignored the issue entirely. Think what that means. The district court didn't ignore the issue. I'm looking at A84. She says, even under the entire market value rule, while the subcoding did not, of course, create consumer demand for omeprazole, it did substantially create the value of the drug as it was formulated by Apotex. And she went on to specifically find that it was crucial because omeprazole would be useless and not commercially viable without the coding. My point is this, though. She did not find, as this court requires, to find that it was the sole driver for the consumer demand. But that's not what the court – our court has used two different formulations. She cites Uniloc. She quotes Uniloc. I believe that. And one of the discussions is imbuing the product with its value. Well, if you look at, for instance, Vernetix, Vernetix restates the same holding that's been – came out of this court multiple times, which is that even if the claimed invention actually makes the difference between success and failure, you still have to recognize that there might be other value drivers for the product. Think of it this way. We ended up being charged for the value of the prior compound. No question about that. Omeprazole, the patent on omeprazole, expired in 2001. There is no question. Every single person who used Apotex's product and got gastric relief, they were getting it because omeprazole reached its target, okay, and actually did its job when it was there. And it reached its target because of the formulation. But if that's the way you looked at it, right, every formulation patent would suddenly be enormously valuable. Well, it depends on how essential it is. If you had a cure for cancer, which had the one small defect that it killed the patient in 100 percent of the cases, but somebody came up with a way to neutralize the toxic effect of that cure, the neutralization would be actually much more valuable than the cure itself because that's what brings the effectiveness of the drug to the patient, right? But that wouldn't allow you to avoid apportionment altogether, Your Honor. You might say in your hypothetical, well, this formulation created 95 percent of the value. I'm sorry to say 100 percent. Well, I wouldn't think so. Well, obviously the compound itself is doing a job as well, so it's got to get some credit, doesn't it? Why? I don't understand that argument. Well, why did you even get a patent on it? Because you anticipated that somebody yourself perhaps might be able to come up with a delivery system. But at the point at which you have no delivery system, it seems to me you have nothing of real value. Well, two things. One is, look, there's a patent on omeprazole itself. And in the patent itself, they talk about the fact that there was a prior art formulation available. But the point is, the value is that it reaches the small intestine. It doesn't reach the small intestine without the protein. But that's not the case here. In the prior art, there was a prior art formulation that actually went all the way all through Phase II clinical trials, and the problem was that it only had 18-month shelf stability rather than something longer, which would have been desirable. So this is not a situation where you're a cancer hypothetical. And, Your Honor, with all respect, even if you came up with a formulation that made the difference, somebody invented the compound that did the work to cure cancer. They have to get some credit, too. Whatever that number is, it can't be 100% to the formulation when the compound itself is doing the work. Aren't we talking about a factual finding that was made by the district court? No. The district court recognized the issue of apportionment but ultimately concluded that nothing below the smallest salable unit in this case was appropriate. Isn't that part a factual finding? Two things. One is she made a finding that, in our view, is exactly contrary to the finding necessary to try to attribute to this formulation patent all the product of sales because she found as a factual matter that the formulation did not create consumer demand. That alone is insufficient under this court's case law. And there's multiple cases now that say the same thing. It has to be the sole driver of consumer demand. That's number one. Number two, the smallest salable unit issue. This court just addressed this in Vernetics in 2014, in September. This was Astra's argument. Astra said to the district court, you don't have to apportion. Why? Because the capsule is the smallest salable unit. Right, but Vernetics didn't say that you always have to go below the smallest salable unit. It said in that particular instance that there were ways to go below it and that the smallest salable unit was such a large measure that in those circumstances it was misleading. But it did not say you always have to go below the smallest salable unit and couldn't have because we have said that multiple times. You don't have to, but when you do, you have to go below the smallest salable unit if that smallest salable unit has meaningful value beyond the claimed formulation itself. And that is clearly the case here. We have a situation where Omeprazole, okay, there was three alternative formulations out in the marketplace that were deemed to be non-infringing. That's number one. There wasn't a prior art. There were alternative formulations that delivered this product adequately all the way to phase two just because it didn't have enough shelf stability for it. It didn't have the shelf stability that one would desire for a commercial product, but it had 18 months. So there is clearly some small, look, this formulation, whatever value the court believes it might have, it can't be 100% because the compound has to get some credit. I'm still having trouble with your argument that it's almost like a moral entitlement argument that the compound is entitled. We're talking about a hypothetical negotiation in which the parties are looking at one thing, the compound, let's go back to my hypothetical. The compound itself is useless by itself, and it's extremely valuable with the coating, let's say, or the non-toxic compound. Why isn't it the case that when the parties are talking about what their hypothetical negotiation would be, they would attribute zero value to the compound itself by itself without any kind of non-toxic element or non-intoxicating element? But you would have to do the reverse as well, Your Honor, because the formulation itself without the compound, it would also be useless. Both arguments can't be right. Could you address, I don't know whether you want to do it now or later, but I want to make sure that we get a chance to hear from you on the pediatric exclusivity argument. I'd be happy to. With pediatric exclusivity, I think the argument is as simple as this. It's a statutory issue. The statutory issue allows for royalties for infringement, which is defined as activity taking place during the term of the patent. So the statute doesn't authorize an award of damages for activity that takes place after the patent expires. That's what the district court did here. She deemed 50% of our profits to be a reasonable royalty and then just extended it during a period which we were not infringing, which is this pediatric exclusivity period. The statute does allow for district courts to extend the period on which by six months the FDA can decline to approve an ANDA, but that's the remedy that Congress provided for the pediatric exclusivity extension of six months. There's nothing in the statute authorizing an award of damages, a reasonable royalty, for activity that is not… But under your argument, you take your argument to its full logical extreme. You could go out with an infringing product. You could practice their patent during that exclusivity period and there's nothing they could do about it if the FDA isn't quick enough on the draw to act, right? That's true. That's true. And the remedy Congress provided was the withdrawal of the approval if the FDA made a mistake or, in the first place, not giving approval. But it's really quite clear in the statute that a reasonable royalty is only available for infringement. I'm sorry. I'm repeating myself. But if activity doesn't take place during the term of a patent, it can't be infringement and therefore there cannot be damages. Now, I understand that the owner or possessor of a pediatric exclusivity period can waive it. That seems not to be in dispute between you, correct? Can they waive their exclusivity period? Right, in favor of a licensee. I would think so, yeah. Yeah, okay. The question I have is if there is a waiver of the pediatric exclusivity, does that apply only to, can you do it individually, party by party, or is the waiver across the board with respect to all parties? I believe you could do it individually, party by party, because I think it would be a matter of contract, right? You'd have a license and you'd license somebody. Is it a question of contract? Because, I mean, the FDA might say, well, nobody asked us. I don't understand how the mechanics work. If you say we're going to waive the period of pediatric exclusivity and we're going to say that the otherwise not entitled party can go ahead and distribute here, doesn't the FDA have something to say about that? I think they do, but I think if you went to the FDA, I think there's more of a practical answer, Your Honor, which I think in real life is accurate, which is you just go to the FDA and you say we have an agreement. Then they don't enforce the rules. Yeah, I think that's what happens. So the second issue I wanted to spend a little bit of time on is an emotional issue. You don't deny, though, that at the moment that the hypothetical negotiation goes on, if the patentee has a pediatric exclusivity period awarded to it, it's something of value to it? No. I think it's something of value to the patent owner. To the patent owner. And so they come to the bargaining table saying I'm thinking about allowing someone to make, use, or sell my product even though I have a right to exclude it. Yeah, I don't disagree. And the patentee wouldn't expect to get anything for that. The patentee wouldn't have a right to – if you were out in the marketplace during that – In the real world, would the patentee expect to get something of value? I think in the real world the patentee would probably want to have something for that. But if for whatever reason the circumstances – If we were to disagree with you on your statutory argument, you don't have any objection? If you disagree with me on my – my argument is my statutory argument and also Berlant. So those two arguments. But if the activity takes place after a patent is expired, it really is quite clear under the statute you ought not be getting damages for it. Can I – You've used up all your time. We'll give you one minute to address this last issue. Switching costs. We – the way the district court valued damages in this case are not based on the value of the – the incremental value of the claims formulation over the prior art. Rather, which is required according to Varian, rather she did it based on switching costs. How long it would take Apotex to get to market, that two-year period. But that has nothing to do with the value of the claimed invention. And this court many times has said damages have to be closely tied. Rescue Net, for instance, has to be closely tied to the value of the patent. Here, part of that two-year delay was how long it would take to get to FDA approval, which clearly has nothing to do with the value of the claimed invention and therefore ought not be driving $100 million damages burden. You have a more general argument, if I could just very briefly. You have a more general argument on a related point of it, saying that you really shouldn't give value to what you refer to as patent holdup costs. Yeah. General. Yeah. My question is, A, why not? And, B, what authority do you have, other than the FDA – I'm sorry, FTC report and the Lemley article for the proposition that the fact that including perhaps the unavailability of the drug from other places that give that patentee significant bargaining power. Why isn't that exactly what we're looking for in hypothetical negotiation? Because I think that – you asked me what my authorities were. You've accurately recited my authorities. But I also have a more general authority, which is Georgia-Pacific. Georgia-Pacific, in this case, will often say – All right. We're real familiar with Georgia-Pacific. We're with you. But it has to be carefully tied to the value of the patent. And so if you have unique circumstances – It begs the question of what the value of the patent is and how you assess it. If you assess it under the hypothetical negotiation, it becomes value that may be attributable to what you're calling holdup. But I think under the statute and under general damages principles, what the patentee gets back is something that's tied to the value of their patent, not unique leverage. Thank you, Your Honor. Okay. We'll restore your three minutes of rebuttal, and we'll give Mr. Trella an additional three minutes on his time if it's needed. Thank you, Your Honor. Excuse me. Let me take the issues in the order that Mr. Hurst addressed them. First, the apportionment issue. And I think there's some confusion in the argument there. Apportionment, at least the way Mr. Hurst was describing it, really has to do with what's the proper royalty base. He didn't talk about the rate at all. And so we talked about giving all the value of the product to the patentee. Well, that's not what happens here. You establish a base, and then you go through Georgia-Pacific to talk about the rate. Now, he focused on the district court statement about that it would be improper to isolate the value of the subcoding. She did not say, as he suggested, that it would be improper to isolate the value of the invention or the advance of the invention. She was talking about the subcoding, which is not the invention. And as the court pointed out in some of your questions, in the paragraphs that follow that statement that Mr. Hurst seizes on, the court explained exactly what the value of the invention was, that the invention, which includes the subcoding, the alkaline-reducing compound, the omeprazole active ingredient, and an enterocoding, was essential to provide a stable and effective product that would get through the stomach, through the small intestine, where it needs to be absorbed. Now, omeprazole unquestionably was enormously valuable, but it could not be used standing alone, as Mr. Hurst pointed out. And Judge Bryson, you asked about, well, what if there's only one delivery mechanism? And truly, in this case, as to Apotex, that was exactly the situation. As Judge Cote pointed out, Apotex worked for seven years to develop its formulation, and what it came up with was an infringing formulation. It tried alternatives, and it abandoned those alternatives because it could not make them work. So to suggest that there was somehow minuscule value to this invention is just completely incompatible with the record. And what you have here is you have the patents claim the entire formulation, the ingredients work together to produce a product that's enormously more valuable than if you just tried to sum some isolated value of each component individually. And that's exactly the situation where you use the entire product as the royalty base. It's not only the smallest saleable patent practicing unit, it is the patented invention as described in these claims. So this is not a case, as the district court recognized, where you even talk about the entire market value rule because it's not a case where the patented invention is one component of a multi-component product. And another reason I think there's some confusion here is that in the district court, Apotex agreed that the proper royalty base was its infringing sales, its sales of the product. And I'd refer the court to appendix pages 33, 4, 17, which is the pretrial order where Apotex includes that statement, and appendix 358, 59, paragraph 41, which is Apotex's damages expert, where he says, obviously he didn't agree with our rate, but he says the proper royalty here should be 7% of Apotex's total omeprazole sales. So we shouldn't even be arguing about what the proper royalty base is or apportionment because that issue effectively was out of the case from the beginning. And what's clear is, and it's clear from all of this court's cases that deal with apportionment and these sorts of issues, that when you have the proper royalty base, whether it's the smallest saleable patent practicing unit or otherwise, then you turn to Georgia-Pacific and that tells you, okay, so how do we value the invention as a percentage of this base in terms of the royalty rate? The district court spent 128 pages doing that here, going through the Georgia-Pacific factors by name, factor 9, 10, 13, 11. She even considered the credibility of the experts, factor 14, and noted that ASCA's experts were more credible. So the analysis was exactly right, and this really boils down to factual findings, none of which actually Apotex specifically challenges as clearly erroneous. And I also would go to the district court's alternative finding where she said, and Judge O'Malley, I think this is what you quoted, even under the entire market value rule. So she found that it didn't apply, but even if it did, she said that the invention substantially created the value of Apotex's product. And that is, in fact, one of the two formulations that this court has adopted for when it's proper to use, and again, this is in the multi-component product setting, but even in that setting, that's when it's proper to use that as the royalty base. And Vironetics, incidentally, is not to the contrary. Page 27 of the slip opinion in that case, this court, again, used both formulations. Either it drives demand, or it substantially creates the value of the infringing product. So apportionment is not an issue here. Now switching costs... That's what I was just going to say. Can you answer his switching costs argument? Yes, I would love to. So I think switching costs, it's wrapped together with the fact that Apotex had no non-infringing alternative available at all. The district court found that repeatedly. I think putting to one side for a moment the question whether it's somehow improper to consider switching costs, and we don't think it is, you don't even get to the question of switching costs unless you have something to switch to. And the district court here found multiple places in her opinion that Apotex had no non-infringing alternative available. Now in Apotex's reply brief, although not in its opening brief, so I think there's a waiver issue here, Apotex in its reply brief argues about, well, there were these other generic formulations, and the district court was wrong to conclude that because those generic producers had patents, that these weren't available to Apotex. Well, there are a couple of problems with that besides the waiver problem. One is the court found that Apotex could not have easily copied those formulations. Putting patents to one side, they used a very different approach, would have required very substantial research and development, and the court found that Apotex would have had no reasonable basis to believe that it could have come up with those formulations. This is not a case like grain processing, for example, where the accused infringer, in fact, within two weeks developed an alternative process that used the same equipment, same alternatives, and produced an identical product. Here Apotex tried for years and failed miserably in coming up with anything but the infringing formulation. And the inferences in this court's case is the presumption is that where the accused infringer does not, in fact, have a non-infringing alternative, the inference is that a non-infringing alternative was not available to it, and it's up to the infringer to prove the contrary. That's what grain processing holds. That's what the SIN court case that the district court relied on holds. That's what this court held in Dupuy v. Medtronic, where it specifically addressed the fact that the accused infringer did not have the non-infringing alternative. So when you get to the complaints about the FDA approval process and all that, which Mr. Hurst alluded to, although briefly, but it's all over the reply brief, the district court did not find, this is not a case where the district court found that the infringer had an alternative but would have been delayed because of this lengthy FDA approval process. The court found that Apotex had no, there was nothing to submit for FDA approval, and it had no reason to think it would have anything to submit for FDA approval. So you don't even get to that question at all in this case on this record. But if you do get to it. No, if you do get to it, Judge Bryson, I don't think there's anything wrong with taking into account the fact, I mean, one of the, let me take a step back. In the hypothetical negotiation, you're looking at, it's a commercial proposition, that's the whole point of it, reproduce what the parties would have agreed to had they sat down at the bargaining table. So if you imagine that in November 2003, Astra has a patented product, a patented formulation that has been FDA approved. We know it works. We know it's acceptable to the FDA. That's an advantage of this formulation. Apotex has no formulation, has no reason to think it can come up with one, even if it could come up with one that would by definition have to be different from Astra's. It has to contend with the fact that it is not an FDA approved formulation, and it will have to get approval. I don't know, and again, I don't think you get to it on this record, but I don't know why it would be inappropriate for the parties or for the court to assume that the parties in a hypothetical negotiation would consider that an advantage of the patented invention, one of the Georgia-Pacific factors, that would be of value to the accused infringer and that they'd be willing to pay for and conversely that the patent owner would want to be compensated for. It is a legitimate factor to consider in an appropriate case. So I think the switching cost issue, again, because there was nothing to switch to, there was no product to submit, and even if there were, so what? It still is an appropriate consideration. Do we have any cases that specifically address this issue squarely? The approval? Well, no, the broader issue of, I'll call it for lack of a better term, the holdup costs, the non-inherent value costs that are associated with the effort to come up with a substitute. I don't know if it's fair to say that it addresses it in those terms. The Apple versus Motorola case, a very recent case from this court, did say it is appropriate to consider the cost and time it would take to develop a non-infringing alternative, which is not exactly on point, but I think it's related because, after all, to the extent that it is difficult to design around and develop a non-infringing alternative, I don't think it's fair to say that that has nothing to do with the value of the patented invention. It, in fact, is central to the value of the patented invention. If there are a million ways around it, well, then the patented invention doesn't have that much value. If it's very difficult to get around, it seems to me that's an appropriate value consideration. What about pediatric exclusivity? Pediatric exclusivity. Well, I think Mr. Hurst acknowledged that, as a matter of economic logic, certainly Apotex wouldn't have agreed to a license that says, okay, you can sell for two years, and then you have to go off the market, and then you can come back on. Do you agree with Mr. Hurst that this can be waived and waived selectively with respect to an individual? Yes, I do. To address, and I think it was your question, Judge Bryson, about the FDA, the FDA has taken the position that it's okay for drug companies with exclusivity periods to waive those in favor of another company. I think we cite the case in our brief, but if we didn't, I'll cite it now. It's the Boehringer case, the District of Columbia. I don't think there's any dispute about that. In fact, interestingly, in this case, the district court noted that the actual first and the filer had basically sold its 180 days of exclusivity to another generic producer. This sort of thing happens. The FDA is aware of it and approves it. As a matter of economic logic, obviously Astra wouldn't give away the exclusivity for nothing, and Apotex wouldn't take a license that didn't include it. There's nothing in the statute that precludes this. Now, the statute does say that a remedy is to revoke any FDA approval that's been given until the expiration of pediatric exclusivity. It doesn't say that's the only remedy. The statute provides for a damages remedy for infringement, and I think that's appropriate here for two reasons. One is, this is a hypothetical negotiation. The parties agreed to that, and this is obviously an element of value that rational commercial entities would have taken into account. So their argument is that you can't get 284 damages. You can't get infringement damages once the patent is gone. Would it have been better for the district court, instead of call them waiver fees, to say that the royalty calculation would have been higher for the period before the patent expires to take into account that there was a six-month exclusivity that was being waived? Would that have changed the analysis? Well, it ought not to change the analysis. I think it would have changed Mr. Hearst's argument, because I don't think he could make the argument he's made today if that's what the district court had done. So I suppose it would have been better for me, because I wouldn't have to respond to that argument. But economically, it obviously makes no difference. If she made the royalty 10 percent higher before the patent expired and said, okay, then it's zero after that, the economics worked out the same, which I think underscores why it doesn't make any sense to come out differently. Now, the other factor here is that... but didn't really create a remedy for a situation in which there had been approval and so the FDA couldn't act to pull it because the case just dragged on. Well, I think it's true to say that Congress created a right, but I think Congress also created a remedy, and I think it is encompassed within Section 284. As Apotex admits in its reply brief, you can get damages based on post-expiration sales when, for example, there was accelerated market entry as a result of the infringement. And I think that's exactly what you have here. If you think about it, Apotex infringed not only by selling the product, but by filing an ANDA with an incorrect Paragraph 4 certification. They filed an ANDA that said, FDA, you can approve us because we're certifying that either these patents are invalid or we don't infringe them. Well, that turned out not to be true, and so that act in and of itself was an act of infringement. If that act of infringement hadn't occurred, Apotex would have never gotten FDA approval until the end of the exclusivity period, so there could have been no sales during that period. So that is an accelerated market entry type of damages scenario, I think, that is appropriately compensated under Section 284. If the Court has no further questions, I will give you back the extra two minutes you gave me. Okay. Thank you. I want to start with the apportionment rule. I recited some case law, but I'd like to read it. This is Laser Dynamics, 2012. Laser Dynamics' use of the entire market value rule was impermissible because Laser Dynamics failed to present evidence showing that the patented disk discrimination method drove demand for the laptop computers, and this is the key, and this was repeated also in Vernetics. It is not enough to merely show that the disk discrimination method is viewed as valuable, important, or even essential to the use of the laptop computer. That's the argument here that you're hearing, that the formulation was essential to the use of the product, and Laser Dynamics said that's not enough. That's the law from this Court. Next. Go back to first principles on this. What is a reasonable royalty designed to address? And this also addresses both the apportionment and the switching cost issue. First principles. This is Rembrandt, stated well, 2014. It's designed to, quote, measure the market value of the invention itself, what it is worth to potential users compared to their using only non-infringing technologies, or RescueNet. It has to be carefully tied to the value of the patented invention, else it punishes beyond the reach of the statute. And here there were alternative formulations, which shows the value of the claimed formulation. You had three on the marketplace that did just as well as Apotex, that did just as well as Astra with alternative formulations, which shows that this formulation wasn't even essential. The claimed formulation wasn't even essential. And at the very least, you had the prior art formulation, which was stable for 18 months. 100% of the value of Apotex product cannot be tied to this claimed formulation. Finally, to the switching cost. The actual factual finding from the district court was the reason we had to pay $100 million in damages is because we would have been delayed two years had we not taken a license as of November 2003. A large portion of that was FDA approval costs, which have nothing whatsoever to do with the value of the claimed invention. Here's how I would say it. When you say a large portion would be FDA approval costs, your recollection of the record is going to be a lot better than mine, but my recollection was that what she was saying is that these periods of FDA approval costs and the time for development would have run contemporaneously, so that it would have taken two years to develop the alternative. Wasn't that what she meant? No, it's incremental. First you develop your formulation, then you go to the FDA with your developed formulation, and then it takes an additional period. So adding those two separately... In your view, she added those as opposed to saying that that period of development would have covered the period of delay. That is my view, Your Honor. She actually made a finding that even if we tried to do some expedited method, it would have required a year. The Astra's expert said it would have required 17 months, and she relied on Astra's expert. Just think of what that means. Say that... Assume this. Apotex could have instantaneously developed an alternative, better formulation on November 2003. Say we could have done that. According to Astra, we'd still owe $60 million in damages because it would take a year to get FDA approval. Look, the commentators have talked about switching costs. I think that when you look at the unique circumstances between the parties, if one party owns some kind of unique leverage that has nothing to do with the value of the claimed invention, it ought not be considered in assessing a reasonable royalty. There must be some tie between the leverage that they have and the value of the claimed invention. And here, at least with respect to the FDA approval time, which can vary wildly and applies to every end of product, not just this one, it had zero to do with the value of the claimed invention. Thank you, Your Honors.